UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-22890-CIV-ALTONAGA/Brown

**MARCIA WILLIAMS**,

    Plaintiff,
vs.

**METROPCS WIRELESS, INC.**,

    Defendant.
_____/

**ORDER**

**THIS CAUSE** came before the Court on Defendant, MetroPCS Wireless, Inc.'s ("MetroPCS['s]") Motion to Compel Arbitration and Stay Litigation ("Motion") [D.E. 22], filed November 18, 2009. The Court has carefully reviewed the parties' written submissions and applicable law.

**I. BACKGROUND**

    A.    **Allegations of Plaintiff's Complaint**

Plaintiff, Marcia Williams ("Williams"), filed a Complaint [D.E. 1] for class action treatment seeking damages and injunctive relief arising out of MetroPCS's false and misleading consumer advertising practices. (*See* Complaint ("*Compl.*") ¶ 1). Specifically, while MetroPCS markets itself as a provider of unlimited nationwide coverage, its coverage reaches less than half of the U.S. population and excludes 11 of the top 25 major U.S. metropolitan areas, such as Washington, D.C. and New Orleans. (*See id.* ¶¶ 3-4, 30). Also, MetroPCS's "$40 a month" "Unlimited Nationwide Coverage" is anything but unlimited as it includes numerous unadvertised charges for "talk and text" features. (*Id.* ¶ 5). Because MetroPCS markets its pre-paid wireless services to lower-income

Case No. 09-22890-CIV-Altonaga/Brown

customers and customers with poor credit history who are unable to obtain conventional wireless service from the major wireless carriers, the false claims made by MetroPCS cause substantial harm to vulnerable customers. (*See id.* ¶ 6).

Williams alleges she is a resident of Seminole County, Florida, and purchased the MetroPCS Unlimited $45 per month plan but has been charged in excess of $225 for one month of service. (*See id.* ¶ 10). Plaintiff and the members of the class she seeks to represent were exposed to MetroPCS's false and misleading marketing and promotional materials. (*See id.* ¶ 18). For example, "MetroPCS offers purportedly flat-rate, unlimited monthly service plans at $30, $35, $40, and $45, all without the requirements of a contract. These flat rate service plans have allowed the Company to differentiate its service from more complex plans and long-term contract requirements of traditional wireless carriers." (*Id.* ¶ 24). In its press releases and marketing materials, MetroPCS represents that "'[w]ith MetroPCS, customers pay by the month, not by the minute, and services do not require a signed contract, deposit or credit check.'" (*Id.* ¶ 26).

Count I of Williams' Complaint states a claim for violation of 47 U.S.C. § 201 *et seq.*, in that as a common carrier engaged in interstate or foreign communication by wire or radio, MetroPCS's charges and other practices described in the Complaint are unjust, unreasonable, and unlawful. (*See id.* ¶¶ 47-49). Count II states a claim for violation of several states' consumer protection laws, given that MetroPCS engages in unfair competition or unfair, unconscionable, or deceptive acts. (*See id.* ¶¶ 54-96). Count III states a claim for unjust enrichment, in that MetroPCS has collected full payment from Williams and members of the class and has retained the payments for services even though the phones and pre-paid wireless services are not as represented. (*See id.* ¶ 101). Williams seeks equitable and declaratory relief, damages, attorney's fees, and trial by jury.

2

Case No. 09-22890-CIV-Altonaga/Brown

**B.        Defendant's Motion to Compel Arbitration and Stay Litigation**

MetroPCS asserts in its Motion that although "Plaintiff's claims have no merit," the parties had agreed that an arbitrator and not the Court should make the determination. (Motion ("*Mot.*") [D.E. 23] at 1). According to MetroPCS, when Williams purchased and used the Unlimited $45 per month wireless service plan from MetroPCS, she accepted and agreed to the MetroPCS Terms and Conditions of Service ("Agreement"). (*See id.* at 2; *Chatterton Decl.* [D.E. 23-1] ¶¶ 21, 32). Jamie Chatterton, MetroPCS's Director of Merchandising, describes Williams' acceptance of the MetroPCS Agreement as follows. MetroPCS's business model is different from the traditional wireless communication service model, which generally requires customers to commit to a term contract for one or two years. (*See Chatterton Decl.* ¶ 6). When signing up for MetroPCS service, customers do not pay in advance for the first month of service but rather buy a cellular handset, enjoying 30 days within which to return it for a full refund. (*See id.* ¶ 7).

MetroPCS's standard business practice is to give new customers a Start of Service Request Form, attached to which is the Agreement. (*See id.* ¶ 13). MetroPCS also provides a Welcome Guide within the packaging of the MetroPCS-branded cellular handsets. (*See id.* ¶ 18). MetroPCS follows these business practices throughout Florida, regardless of retail channel. (*See id.* ¶ 14). The Welcome Guide states that by using the MetroPCS wireless service, the customer agrees to the Agreement. (*See id.* ¶ 21). The Welcome Guide also refers customers to the MetroPCS website, and at the footer of the website is a "convenient hyperlink" called "Terms and Conditions" that directs subscribers to a copy of the Agreement. (*Id.* ¶¶ 24-25). Purchasers may also buy handsets on the MetroPCS website, where the Agreement is available. (*See id.* ¶ 28).

Although the Agreement has been revised from time to time, it has always contained a

3

Case No. 09-22890-CIV-Altonaga/Brown

provision that conditions a customer's initiation or use of the MetroPCS wireless service upon acceptance of the Agreement. (*See id.* ¶ 32). And, at all times the Agreement has contained an arbitration provision, requiring that claims or controversies relating to or arising out of the Agreement be resolved through individual binding arbitration. (*See id.* ¶ 33). Consistent with all of these business practices, Williams would have received a copy of the Agreement when she initiated service. (*See id.* ¶ 34).

Ms. Chatterton supplies with her declaration several versions of the MetroPCS Start of Service Request Form, attached to which is the Agreement Williams would have accepted. One of these Start of Service Request Forms states:

> **IMPORTANT: PLEASE READ THIS AGREEMENT CAREFULLY. IF YOU ARE A NEW CUSTOMER, WHEN YOU INITIATE SERVICE BY ATTEMPTING TO PLACE A CALL ON METROPCS'S WIRELESS SYSTEM OR TO USE ANY OTHER SERVICE, YOU AGREE TO THIS AGREEMENT . . . . BY USING METROPCS'S WIRELESS SYSTEM OR ANY OTHER SERVICE, YOU ARE INDICATING YOUR INTENT TO BE BOUND BY THE TERMS AND CONDITIONS OF SERVICE OF THIS AGREEMENT. IF YOU ARE A NEW CUSTOMER AND YOU DO NOT AGREE TO THIS AGREEMENT, DO NOT INITIATE SERVICE.**

(*Id.*, Ex. A, p. 3 of 6) (emphasis in original).

The Welcome Guide similarly calls attention to the customer's acceptance of the Agreement, stating, "first things first – . . . For further information about our wireless service, please also read the MetroPCS Terms and Conditions of Service." (*Id.*, Ex. D, p. 2 of 3). The Welcome Guide refers the customer to the MetroPCS website, where the most current version of the Agreement is found, and which states in part:

> **Start of Service Form/Rate Plan/Coverage Brochure.** When you initiate Service with MetroPCS, you should receive your Start of Service form, this Agreement, and a brochure detailing the coverage available in your service area. These materials are

Case No.  09-22890-CIV-Altonaga/Brown

> part of your Agreement with MetroPCS. . . .  If you do not receive the Start of Service Form or the other documents, you may obtain a copy from us, our dealers, or our web site at www.metropcs.com.

(*Id.*, Ex. F, p. 2 of 8) (emphasis in original).

The MetroPCS Agreement has always contained an arbitration provision, obligating customers to resolve their disputes with MetroPCS through binding arbitration.  Thus, if a customer receives or accesses on the MetroPCS website the Agreement, and then reaches page 7 of 8 of the single-spaced typewritten text of the Agreement, in the middle of the third page of continuous bold text appears the customer's agreement to arbitrate disputes.  The arbitration provision states as follows:

> **Arbitration; Dispute Resolution.  Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or Services provided to you under this Agreement, including (without limitation) statutory, tort and contract Claims and Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved, upon the election by you or us, by binding arbitration, . . . . The party filing an arbitration must choose one of the following three arbitration administrators: National Arbitration Forum; American Arbitration Association; or JAMS. These administrators are independent from us, and you must follow their rules and procedures for initiating and pursuing an arbitration.  If you initiate the arbitration, you must also notify us in writing at the address set forth in the "Notices" section above.  If we initiate the arbitration, we will notify you in writing at your then current billing address or (if your account is closed) the last address at which we contacted you.  Any arbitration hearing that you attend will be held at a place chosen by the arbitrator or arbitrator administrator in the same city as the U.S. District Court closest to your billing address . . . .**
>
>       \*                \*                \*
>
> This arbitration agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), and shall be conducted under the applicable procedures and rules of the arbitration administrator that are in effect on the date the arbitration is filed, unless this arbitration provision is inconsistent with those procedures and rules, in which case this Agreement will prevail.  These procedures and rules may limit the

amount of discovery available to you or us. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations, and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered in any court having jurisdiction. No class actions, other representative actions, or joinder or consolidation of any Claim with a Claim of any other person or entity shall be allowable in arbitration, without the written consent of both you and us. This arbitration agreement applies to all Claims now in existence or that may arise in the future. This arbitration agreement survives the termination of this Agreement or the Service relationship. If any portion of this arbitration agreement is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force.

**IF ARBITRATION IS CHOSEN BY YOU OR US WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM THROUGH A COURT. IF ARBITRATION IS CHOSEN, YOU AND WE WILL NOT HAVE RIGHTS THAT ARE PROVIDED IN COURT INCLUDING THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT SUCH AS CLASS ACTION LITIGATIONS. OTHER RIGHTS INCLUDING THE RIGHT TO DISCOVERY AND THE RIGHT TO APPEAL ARE ALSO LIMITED OR ELIMINATED BY ARBITRATION. BY USING THIS SERVICE, YOU EXPRESSLY WAIVE YOUR RIGHT TO A JURY TRIAL IN THE EVENT THAT EITHER PARTY SELECTS ARBITRATION TO RESOLVE THE DISPUTE UNDER THIS AGREEMENT.**

**Unless otherwise provided by applicable law, neither party has the right to bring a Claim or other legal action under these Terms and Conditions more than two years after the cause of action arose. Notwithstanding the foregoing MetroPCS has the right to institute legal or equitable proceedings in any court of competent jurisdiction for claims or disputes regarding: (i) amounts owed by you in connection with your purchase of Service, or (ii) your violation of the provisions of this Agreement.**

(*Id.* at pp. 7-8).

According to MetroPCS, the arbitration provision has consumer-friendly provisions making the arbitral process less costly and more flexible. (*See Mot.* at 4). Subscribers, for example, may select a convenient arbitral forum, their preferred arbitrator, take discovery, appeal an arbitral award, and recover attorneys' fees if the award is justified under the law pursuant to which they seek relief.

6

Case No. 09-22890-CIV-Altonaga/Brown

(*See id.* at 4-5).

Because Williams agreed to arbitrate her claims of false and misleading advertising and waived her right to bring a putative class action in court, MetroPCS seeks an order compelling her to arbitrate and staying this litigation. MetroPCS maintains its Agreement is neither procedurally nor substantively unconscionable and should be enforced.

**C.    Plaintiff's Defenses to the Motion to Compel Arbitration**

Williams mounts a formidable opposition to the Motion. Williams' contention is that MetroPCS's advertisements repeatedly state there is "no contract," and there are "never any contracts" required in obtaining MetroPCS service. Furthermore, Williams never received any Agreement containing the arbitration provision. Even if the Court finds the parties entered into an agreement to arbitrate, the MetroPCS Agreement is procedurally and substantively unconscionable.

While MetroPCS has narrated its customary practice through the Chatterton Declaration, Williams is unequivocal that she at no time received the Agreement. First, Williams understood from "numerous advertisements . . . that [she] could obtain MetroPCS wireless service without ever signing a contract. Not only did these advertisements indicate that [she] never had to sign a contract, but that there were 'no contracts' and 'never any contracts' required in obtaining MetroPCS service." (*Williams Decl.* [D.E. 31] ¶ 4). Specifically, she remembers an advertisement featuring a Unicorn and a mermaid stating no contract was required, several other commercials along the same lines or theme with the 'no contract' language, and a commercial featuring a contract being passed through an animated paper shredder and moments later a drawing of a contract with a circle and diagonal line or slash through it. (*See id.* ¶¶ 5-6). To her the contract with a circle and slash through it indicated there was no contract, not that there was a contract with a hidden arbitration clause she

7

Case No. 09-22890-CIV-Altonaga/Brown

never saw or understood. (*See id.* ¶ 7). Similarly, to her the phrase "no contract" means no contract. (*See id.*). Contrary to MetroPCS's assertion stated for the first time in its Reply that the term "no contract" "is the standard industry term for prepaid service plans with no long-term commitment and not termination fee" (*Reply* [D.E. 38] at 4), Williams had no such understanding of the existence of such an industry term, if one indeed exists.

At the time she commenced wireless service with MetroPCS, Williams was never told by anyone in the MetroPCS store that she had to enter into a contract to obtain service or that there would be an agreement to arbitrate. (*See Williams Decl.* ¶ 8). According to Williams,

> At the time service was commenced, a MetroPCS salesman at the store took my personal information and entered it into a computer. I was not given a copy of the information the MetroPCS employee entered into the computer, nor was I given a MetroPCS "Terms of Service" form or booklet. I never signed any forms or documents at the MetroPCS store and have not subsequently signed any forms for MetroPCS or received anything in the mail from MetroPCS.
>
> *               *               *
>
> The text messages I received from MetroPCS never mentioned nor contained either the "Terms of Service" or any agreement to arbitrate.
>
> I never received a copy of the MetroPCS "Terms of Service" and never agreed to arbitrate any disputes.

(*Id.* ¶¶ 12, 14-15). By "booklet" Williams is referring to the Welcome Guide, which she never received. (*Williams Rebuttal Decl.* [D.E. 42-2] ¶ 2). Moreover, the Guide did not accompany the handset she purchased; the only document with the phone was the manual applicable to her Kyocera phone.[1] (*See id.* ¶¶ 3-4).

---

[1] MetroPCS argues the Williams Rebuttal Declaration is a sham and should not be considered. (*See Response to Sur-Reply* [D.E. 43] at 2-3). The Williams Rebuttal Declaration, however, does not create an inherent consistency with the first Williams Declaration. *See Lawver v. Hillcrest Hospice, Inc.*, 300 F. App'x 768, 771 (11th Cir. 2009 ) ("A district court must find that the party's affidavit and deposition contain an

8

Regarding billing, Williams was informed she would receive only a text message informing her of the amount owed, her account number, and when her payment was due. (*See Williams Decl.* ¶ 13). She was told there would be a monthly charge if she wanted an electronic or paper bill in addition to the text message. (*See id.*). She did not elect to receive an electronic or paper bill. (*See id.*). The text messages she received did not mention the Agreement. (*See id.* ¶ 14).

In any event, and in the alternative, Williams asserts the MetroPCS Arbitration Agreement is procedurally and substantively unconscionable.

## II. ANALYSIS

### A.  Standard

MetroPCS's arbitration clause states "[t]his arbitration agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA")." (*Chatterton Decl.,* Ex. A, p. 6 of 6). The FAA establishes a general federal policy favoring arbitration. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217-18 (1985). Section 2 of the FAA requires the enforcement of arbitration clauses in contracts covered by the provisions of the Act, stating:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Supreme Court has recognized that "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or

---

inherent inconsistency before it can disregard an affidavit.") (citing *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007)).

procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

The FAA further provides that

> [i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. If a party in a dispute fails to arbitrate under the agreement, pursuant to Section 4

> [a] party aggrieved by the alleged failure, neglect, or refusal to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue.

9 U.S.C. § 4.

"While there is a liberal federal policy favoring arbitration agreements, 'the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate.'" *Becker v. Davis*, 491 F.3d 1292, 1298 (11th Cir. 2007) (quoting *Klay v. All Defendant*s, 389 F.3d 1191, 1200 (11th Cir. 2004)). Consequently, when considering a motion to compel arbitration pursuant to Section 4 of the FAA, a district court must undertake a two-step inquiry. *See Scott v. EFN Invs., LLC*, 312 F. App'x 254, 256 (11th Cir. 2009) (citing *Klay*, 389 F.3d at 1200); *Patriot Mfg., Inc. v. Dixon*, 399 F. Supp. 2d 1298, 1300 (S.D. Ala. 2005) (citing *Mitsubishi Motors Corp. v. Soler*

*Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-28 (1985)). The first step is to determine whether the parties agreed to arbitrate the dispute, a determination made by reference to the "'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].'" *Mitsubishi Motors Corp.*, 473 U.S. at 626 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24). If the court concludes that the parties did agree to arbitrate the dispute in question, then the second step is to consider whether legal constraints external to the parties' agreement foreclose the arbitration of those claims. *See Patriot Mfg., Inc.*, 399 F. Supp. 2d at 1301.

    **B.**    **Is there an agreement to arbitrate the dispute?**

With respect to the first step of the analysis, the parties acknowledge that no signature is required to meet the "written" requirement of the FAA; rather acceptance of the contract may be manifested by performance. *See, e.g., Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005) ("employees' acceptance was by continuing their employment"). And while "as with any other contract, the parties' intentions control, . . . those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp.*, 473 U.S. at 626. "Presumption notwithstanding, 'the courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties.'" *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1057 (11th Cir. 1998) (quoting *Goldberg v. Bear, Stearns & Co., Inc.*, 912 F.2d 1418, 1419-20 (11th Cir. 1990)). At bottom, parties cannot be forced to submit to arbitration if they have not agreed to do so. *See Goldberg*, 912 F.2d at 1419.

In her Memorandum in Opposition, Williams placed squarely at issue her non-assent to the Agreement. With her supporting declaration, she stated she was advised through several marketing strategies employed by MetroPCS that there would be no contracts. She was given no Welcome

Case No. 09-22890-CIV-Altonaga/Brown

Guide (notwithstanding MetroPCS's attempt in its Reply to attribute such a concession by her), nor was she given the Start of Service Form. She did not access the MetroPCS website to see the hyperlink that would direct her to the Agreement. While she did receive documentation with her Kyocera phone, it was literature pertaining to the phone and not to MetroPCS wireless service and the terms of a contract MetroPCS had stated in repeated advertisements would not exist.

The decision that controls the Court's analysis in this regard is *Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851 (11th Cir. 1992). In *Chastain* the court affirmed the district court's denial of a motion to compel arbitration after the plaintiff had presented a detailed affidavit stating she had never agreed to arbitration, and the defendant acknowledged she had not signed the customer agreements containing the arbitration language. The court squarely addressed and announced the rule that governs where the party seeking to avoid arbitration has not signed any contract requiring arbitration:

> Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. *See T & R Enters. v. Continental Grain Co.*, 613 F.2d 1272, 1278 (5th Cir. 1980). Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract *in general*. *See Prima Paint*, 388 U.S. at 403-04, 87 S.Ct. at 1806. Because the making of the arbitration agreement *itself* is rarely in issue when the parties have signed a contract containing an arbitration provision, the district court usually must compel arbitration immediately after one of the contractual parties so requests. *Id.*
>
> The calculus changes when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration. In such a case, that party is challenging the very existence of *any* agreement, *including the existence of an agreement to arbitrate*. Under these circumstances, there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the Act. If a party has not signed an agreement containing arbitration language, such a party may not have agreed to submit grievances to arbitration at all. Therefore, before sending any such grievances to arbitration, *the district court itself*

Case No. 09-22890-CIV-Altonaga/Brown

must first decide whether or not the non-signing party can nonetheless be bound by the contractual language. *See Cancanon v. Smith Barney, Harris, Upham & Co.*, 805 F.2d 998, 1000 (11th Cir. 1986) (per curiam) ("[W]here the allegation is one of . . . ineffective assent to the contract, the issue [of arbitrability] is not subject to resolution pursuant to an arbitration clause contained in the contract documents.").

In cases of this type, the proper rule has been stated by our predecessor court:

> "To make a genuine issue entitling the [party seeking to avoid arbitration] to a trial by jury [on the arbitrability question], an unequivocal denial that the agreement had been made [is] needed, and some evidence should [be] produced to substantiate the denial."
>
> *T&R*, 613 F.2d at 1278 (quoting *Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)) . . . .

957 F.2d at 854 (emphasis in original) (footnote call number omitted).

Under *Chastain* a party does not place the making of the arbitration agreement in issue simply by stating no agreement exists. *Id.* at 855. Instead, the party making that assertion "must substantiate the denial of the contract with enough evidence to make the denial colorable." *Id. See also Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 817-18 (11th Cir. 1993) (applying *Chastain* and affirming district court's denial of requested arbitration where facts presented "an even more compelling basis for reaching" the same conclusion as in *Chastain*, and where "to the extent it is possible to prove a negative," party offered evidence to prove there was no agreement to arbitrate).

Williams has satisfied her burden under *Chastain*, entitling her to have the question of the making of the arbitration agreement submitted to a jury. *See* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."). First, there is no signed Agreement between the parties, triggering *Chastain*. Second, Williams has unequivocally and under oath submitted detailed declarations stating she never agreed to arbitrate her disputes with MetroPCS. Lastly, "to the extent it is possible to prove a negative," *Wheat, First*

13

Case No. 09-22890-CIV-Altonaga/Brown

*Sec., Inc.*, 993 F.2d at 817, Williams has presented evidence to substantiate her denial. She has described the several MetroPCS advertisements that indicated she should not expect a contract, she described that with her Kyocera phone she received information about the phone but not about MetroPCS's Agreement, and she denies ever receiving the Start of Service Form. She never accessed the MetroPCS website that would have contained the hyperlink that would have taken her to the Agreement. In the face of her sworn denials, all MetroPCS can do is offer a description of its standard business practices in a variety of settings; from purchases made in person to purchases made via the internet. MetroPCS has not presented any information from the Williams account to substantiate any assertion that Williams was ever given the Agreement, saw it on the MetroPCS website, or was mailed a copy of the Agreement.

Williams appropriately relies on *General Impact Glass & Windows Corp. v. Rollac Shutter of Texas, Inc.*, 8 So. 3d 1165 (Fla. 3d DCA 2009). In *General Impact Glass & Windows Corp.*, defendant's terms and conditions (which required arbitration) were available to plaintiff on defendant's website and in defendant's catalog. *Id.* at 1166. In reversing the trial court after it compelled arbitration, the appellate court emphasized that the terms and conditions were never signed by plaintiff and were never expressly incorporated into or attached to any of the documents that formed the contract between the parties. *Id.* at 1167. And the provision relating to arbitration in defendant's website and catalog was part of a separate collateral document that was never incorporated into the parties' agreement. *Id.*

MetroPCS cites to a number of decisions for the proposition that Williams' acceptance of the benefits of the Agreement constitutes acceptance of the Agrement, but all of these are distinguishable from the facts presented here. (*See Reply* at 3) (citing cases). In *Fonte v. AT&T*

14

Case No. 09-22890-CIV-Altonaga/Brown

*Wireless Services, Inc.*, 903 So. 2d 1019, 1021 (Fla. 4th DCA 2005), AT&T presented evidence that every phone comes with the AT&T Wireless Welcome Guide, which contained the challenged terms and conditions, and plaintiff signed the personal service agreement which incorporated the terms and conditions. In *Brueggemann v. NCOA Select, Inc.*, No. 08-80606-CIV, 2009 WL 1873651, at *2 (S.D. Fla. June 30, 2009), plaintiff did not provide any sworn statements or evidence in support of his contention that he never saw or agreed to the terms and conditions, and when purchasing on the website, plaintiff was informed he was agreeing to the terms and conditions. In *Rampersad v. Primeco Personal Communications, L.P.*, No. 01-6640-CIV, 2001 WL 34872572, at *1-2 (S.D. Fla. Oct. 16, 2001), plaintiff was suing for breach of contract while arguing he did not agree to the arbitration provisions; his failure to read the terms of his service agreement contained in defendant's brochures did not relieve him of his obligation to arbitrate his claims. In *Briceno v. Spring Spectrum, L.P.*, 911 So. 2d 176, 178 (Fla. 3d DCA 2005), the college-educated plaintiff entered into a contract for cellular telephone service which was contained in the packaging of defendant's telephone; in an invoice to plaintiff the defendant informed her that changes to the terms and conditions could be found on defendant's website; and plaintiff admitted to seeing the terms and conditions internet link but did not care to click it. *See also Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1150 (7th Cir. 1997) (enforcing arbitration agreement found in software box because plaintiff did not return computer within 30 days); *Ozormoor v. T-Mobile USA, Inc.*, No. 08-11717, 2008 U.S. Dist. LEXIS 58725, at *8-9 (E.D. Mich. June 19, 2008) (plaintiff entered into a one-year service agreement for wireless phone service and renewed the agreement; both agreements contained terms requiring arbitration, and plaintiff received at least one physical copy of the agreement containing the arbitration provisions).

Case No. 09-22890-CIV-Altonaga/Brown

In all of the cases relied on by MetroPCS there was evidence that the plaintiff had received or been informed in some manner of the arbitration agreement. Here, in contrast, there is no evidence that Williams ever received the Agreement or was made aware of it in any documents accompanying her Kyocera phone or in any text messages relaying her bills. Indeed, the billing here was paperless and contained minimal information. More importantly, MetroPCS at various times informed her through its advertisements that there would be no contracts.[2]

This case also does not present the situation where a defendant attests to its standard business practice or actual mailing of the agreement to the plaintiff, giving rise to a rebuttable presumption that an item properly mailed was received by the addressee. *See Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996). The plaintiff's inability to rebut that presumption is what in large part has prompted other courts to find the existence of a valid arbitration agreement. *See, e.g., Rivera v. AT&T Corp.*, 420 F. Supp. 2d 1312, 1320 (S.D. Fla. 2006) (plaintiff's denial of receiving the customer service agreement ("CSA") was insufficient under *Chastain* to send the arbitration question to a jury where defendant submitted evidence it had mailed plaintiff the CSA (which was never returned) and included notices about the CSA in its monthly billing statements); *Sanders v. Comcast Cable Holdings, LLC*, No. 3:07-cv-918-J-33HTS, 2008 WL 150479, at *5-6 (M.D. Fla. Jan. 14, 2008) (plaintiffs' affidavits denying receipt of agreement did not rise to the level necessary to rebut the presumption of receipt created when the arbitration notices were mailed to plaintiffs and

---

[2] The two cases MetroPCS cites in its Response to the Sur-Reply are similarly distinguishable. *See Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518-20 (3d Cir. 2007) (plaintiff admitted in pleadings he was a party to a subscription agreement, which contained an arbitration clause); *Schafer v. AT&T Wireless Servs., Inc.*, No. 04-4149-JLF, 2005 WL 850459, at *1-2 (S.D. Ill. Apr. 1, 2005) (plaintiff received her phone via mail; the box containing the phone informed her of certain terms and conditions and referred her to a booklet containing more detailed terms and conditions).

16

Case No.  09-22890-CIV-Altonaga/Brown

where the arbitration notices were contained in the same envelope as the cable bills, which were received and paid).

MetroPCS asserts that it is entitled to a hearing before its Motion is resolved if Williams' denial creates a genuine issue of material fact.  (*See Reply* at 2 n.3; Response to Sur-Reply at 5). Under 9 U.S.C. § 4, if the making of the arbitration agreement is in issue, the Court is instructed to "proceed summarily to the trial thereof."  *See also Chastain*, 957 F.2d at 854 ("[I]t is clear that Chastain is entitled to a trial on the issue of whether or not she is bound by the customer agreements.").  Thus, the Court concludes that the proper procedure is to deny without prejudice the present Motion, proceed to jury trial on the limited question of whether or not Williams and MetroPCS entered into the Agreement at all,[3] and then if the answer is in the affirmative, address the remaining objections concerning legal constraints external to the parties' agreement which may or may not foreclose arbitration of the claims asserted in the Complaint.

### III. CONCLUSION

In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that Defendant, MetroPCS Wireless, Inc.'s Motion to Compel Arbitration and Stay Litigation **[D.E. 22]** is **DENIED** without prejudice.  The parties are to submit a revised scheduling report, by **January 15, 2010**, addressing proposed deadlines for a

---

[3] As the parties may already recognize, if Williams prevails in a trial on this issue and then seeks to certify a class, it is apparent that to determine membership in the class, detailed individual inquiry will be required.  As one court has explained, "[b]ecause it would be impossible to definitively identify class members prior to individualized fact-finding and litigation, the proposed classes and sub-class fail to satisfy one of the basic requirements for a class action under Rule 23 of the Federal Rules of Civil Procedure." *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 446 (E.D. Pa. 2000).  *See also Perez v. Metabolife Int'l Inc.*, 218 F.R.D 262, 269 (S.D. Fla. 2003) ("A court should deny class certification where the class definitions are overly broad, amorphous, and vague, or where the number of individualized determinations required to determine class membership becomes too administratively difficult.").

Case No.  09-22890-CIV-Altonaga/Brown

summary trial on the issue of whether the parties entered into the Agreement.

**DONE AND ORDERED** in Chambers at Miami, Florida this 5th day of January, 2010.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record