## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-22890-CIV-ALTONAGA/Brown

**MARCIA WILLIAMS**, on behalf of
herself and others similarly situated,

       Plaintiffs,

vs.

**METROPCS WIRELESS, INC.,**

       Defendants.

_____/

### ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

       This case was tried to the Court on April 16 and 19, 2010 on the limited question whether Plaintiff, Marcia Williams ("Williams") entered into an arbitration agreement with Defendant, MetroPCS Wireless, Inc. ("MetroPCS"). The Court has carefully considered the evidence, arguments and written submissions of the parties, and applicable law. The following findings of fact and conclusions of law are now made pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure.

### A.      Plaintiff's Allegations

       Ms. Williams filed an Amended Complaint [D.E. 53] for class action treatment seeking damages and injunctive relief arising out of MetroPCS's false and misleading consumer advertising practices. (*See* Am. Compl. ¶ 1). Specifically, while MetroPCS markets itself as a provider of unlimited nationwide coverage, its coverage reaches less than half of the U.S. population and excludes 11 of the top 25 major U.S. metropolitan areas. (*See id.* ¶¶ 3-4). Also, MetroPCS's "$40 a month" "Unlimited Nationwide Coverage" is anything but unlimited as it includes numerous

Case No.  09-22890-CIV-Altonaga/Brown

unadvertised charges for "talk and text" features.  (*Id.* ¶ 5).  MetroPCS also prominently advertises that its unlimited nationwide calling plans are available with "NO CONTRACT," when in reality it orchestrates a scam consisting of a secret arbitration clause included in a hidden "contract" MetroPCS does not provide to customers. (*See id.* ¶¶ 6-9).  Because MetroPCS markets its pre-paid wireless services and "no-contract" deals to lower-income customers and customers with poor credit history who are unable to obtain conventional wireless service from the major wireless carriers, the false claims made by MetroPCS cause substantial harm to vulnerable customers.  (*See id.* ¶ 8). MetroPCS has never arbitrated any dispute pursuant to its secret arbitration provisions.  (*See id.* ¶ 10).

Ms. Williams alleges she is a resident of Seminole County, Florida, and purchased the MetroPCS Unlimited $45 per month plan but has been charged in excess of $225 for one month of service.  (*See id.* ¶ 14).  Plaintiff and the members of the class she seeks to represent were exposed to MetroPCS's false and misleading marketing and promotional materials, and unjust, unreasonable, and unlawful charges and practices.  (*See id.* ¶ 22).  For example, "MetroPCS offers purportedly flat-rate, unlimited monthly service plans at $30, $35, $40, and $45, all without the requirements of a contract.  These flat rate service plans have allowed the Company to differentiate its service from more complex plans and long-term contract requirements of traditional wireless carriers." (*Id.* ¶ 28). In its press releases and marketing materials, MetroPCS represents that "'[w]ith MetroPCS, customers pay by the month, not by the minute, and services do not require a signed contract, deposit or credit check.'"  (*Id.* ¶ 30).  MetroPCS's deceptive and false advertising consists of claims of "unlimited nationwide coverage," and unlimited text and talk features for stated charges.  (*See id.*

2

Case No.  09-22890-CIV-Altonaga/Brown

¶¶ 42-49).

Count I of Ms. Williams' Amended Complaint states a claim for violation of 47 U.S.C. § 201 *et seq.*, in that as a common carrier engaged in interstate or foreign communication by wire or radio, MetroPCS's charges and other practices described are unjust, unreasonable, and unlawful.  (*See id.* ¶¶ 51-58).  Count II states a claim for violation of several states' consumer protection laws, given that MetroPCS engages in unfair competition or unfair, unconscionable, or deceptive acts.  (*See id.* ¶¶ 59-106).  Count III states a claim for unjust enrichment, in that MetroPCS has collected full payment from Ms. Williams and members of the class and has retained the payments for services even though the phones and pre-paid wireless services are not as represented.  (*See id.* ¶¶ 107-09). Ms. Williams seeks equitable and declaratory relief, damages, attorney's fees, and trial by jury.

**B.     Factual Findings**

The sole purpose for the trial conducted was for the Court, as fact-finder, to resolve whether the parties had entered into an agreement to arbitrate, as urged by MetroPCS in its Motion to Compel Arbitration and Stay Litigation ("Motion to Compel Arbitration") [D.E. 22], filed November 18, 2009 in response to Plaintiff's initial Complaint.  The Order of January 5, 2010 [D.E. 44] denied the Motion to Compel Arbitration without prejudice because MetroPCS had not sustained its burden of showing the parties had entered into an agreement to arbitrate.  The case was therefore set for the summary trial which took place.  *See* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof.").

MetroPCS submitted three versions of the "MetroPCS Terms and Conditions of Service" ("Terms and Conditions") with its Motion to Compel Arbitration (*see* [D.E.'s 23-2, 23-3, 23-4]).

Case No.  09-22890-CIV-Altonaga/Brown

At trial MetroPCS introduced in evidence the version of the Terms and Conditions in effect on

November 18, 2008.  (*See* Def.'s Ex. 12).

The Terms and Conditions state in bold text:

> **IMPORTANT: PLEASE READ THIS AGREEMENT CAREFULLY. IF YOU ARE A NEW CUSTOMER, WHEN YOU INITIATE SERVICE BY ATTEMPTING TO PLACE A CALL ON METROPCS'S WIRELESS SYSTEM OR TO USE ANY OTHER SERVICE, YOU AGREE TO THIS AGREEMENT AND ALL APPLICABLE LAWS.  BY USING METROPCS'S WIRELESS SYSTEM OR ANY OTHER SERVICE, YOU ARE INDICATING YOUR INTENT TO BE BOUND BY THE TERMS AND CONDITIONS OF SERVICE OF THIS AGREEMENT. IF YOU ARE A NEW CUSTOMER AND YOU DO NOT AGREE TO THIS AGREEMENT, DO NOT INITIATE SERVICE.  IF YOU ARE AN EXISTING CUSTOMER AND THE SERVICE IS PROVIDED TO YOU UNDER A PRIOR AGREEMENT AND YOU DO NOT AGREE TO THIS AGREEMENT, YOU MUST TERMINATE SERVICE AS SET FORTH IN THE PRIOR AGREEMENT; PROVIDED, HOWEVER, THAT IF YOU CHOOSE TO TERMINATE SERVICE YOU WILL STILL BE BOUND BY THE PRIOR AGREEMENT, INCLUDING YOUR OBLIGATION TO PAY ANY OUTSTANDING AMOUNTS.**

(*Id.* at 1).  The Terms and Conditions include a limitation of liability provision, an arbitration and

dispute resolution provision which includes a waiver of right to trial by jury and which exempts

MetroPCS from having to arbitrate, and a prohibition on a customer instituting or participating in

a class action.  (*See id.* at 5-6).  The arbitration provision further states that "[t]his arbitration

agreement applies to all Claims now in existence or that may arise in the future."  (*Id.* at 6).  The

Terms and Conditions do not include a space for the contracting parties' signatures.

No Terms and Conditions signed by Ms. Williams exist.  Indeed, MetroPCS has not

produced copies of the MetroPCS Terms and Conditions signed by any of its customers or members

of the putative class defined by Ms. Williams in her Amended Complaint.  (*See* Am. Compl. ¶ 16

("[A]ll persons in the United States who, within the relevant statute of limitations period, purchased

Case No.  09-22890-CIV-Altonaga/Brown

'unlimited' wireless services from MetroPCS.")).

No collateral document signed by Ms. Williams acknowledging that she received or agreed to the Terms and Conditions exists.  The only relevant document bearing Ms. Williams' signature is a store copy of a credit card receipt dated March 18, 2009.  (*See* Def.'s Ex. 51).  The slip shows a charge of $54.53, followed by the statement: "I agree to pay the above total amount according to the card issuer agreement (Merchant Agreement if Credit Voucher)." (*Id.*).  Ms. Williams' signature appears directly below this statement.  Further down the receipt the following text appears:

> Thank you for choosing MetroPCS!
> The Metro Promise:
> "Return the phone or accessory within 30 days of original purchase with less than 60 minutes of airtime usage to receive a full refund."
> Refunds apply to new activations only.  Handset upgrades are non-refundable.
> Visit www.metropcs.com to view new Terms and Conditions of Service.

(*Id.*).

Prior to Ms. Williams purchasing her first cellular phone with MetroPCS in February 2007, MetroPCS ran numerous advertisements representing to customers that MetroPCS services involved "no contract." (*See* Pl.'s Exs. 15, 16, 23).  One advertisement shows a contract being passed through an animated paper shredder and moments later a drawing of a contract with a circle and diagonal line or slash through it.  (*See* Pl.'s Ex. 15). Another advertisement Ms. Williams saw contains the following narrative between a mermaid and a unicorn:

Mermaid: So, I'm thinking of switching to that new MetroPCS service.

Unicorn: What, the talk-all-you-want-for-forty-dollar thing?

Mermaid: Yeah.

Unicorn: You believe in that?

Case No.  09-22890-CIV-Altonaga/Brown

Mermaid: Yeah. Why not?

Unicorn: Um, um-hum, sounds a little farfetched to me.

Announcer: Introducing a wireless plan so fantastic, it sounds like make-believe. Unlimited talk and text for just forty dollars a month and no contract.  MetroPCS.

Animated Voice: Hello.  Hello.  Hello.

Announcer: Unlimit yourself.

(Pl.'s Ex. 16a).  Ms. Williams saw several of these advertisements; and it was important to her that she would not need to have a contract with MetroPCS, as she had had one with her prior service provider, Sprint, and she did not want one.

The exterior of the box for every phone sold by MetroPCS has the words "No Contract" in large type on the front center of the box.  At the back of the box in fine print appear the words "Terms and Conditions of Service."  Various pages of the MetroPCS website also include the words "no contract."  MetroPCS at all times includes a link to the Terms and Conditions on its website, but the link appears at the bottom left hand corner in small type.

Ms. Williams visited MetroPCS retail stores on four occasions to purchase phones and start service.  She purchased her first MetroPCS phone in February 2007 from a MetroPCS authorized dealer in Orlando, Florida.  In March 2009 she purchased a MetroPCS phone for her grandson Jayden at a MetroPCS store in Winter Park, Florida.  In June 2009 she purchased a MetroPCS phone for herself from a MetroPCS store in Brooklyn, New York.  During her visits to these authorized dealers, Ms. Williams was never told by anyone that she had to enter into a contract to obtain service nor was she told the Terms and Conditions were a contract or that an agreement to arbitrate existed within any Terms and Conditions.

6

Case No.  09-22890-CIV-Altonaga/Brown

It is nevertheless MetroPCS's standard business practice to give new customers a Start of Service Request form, attached to which are the Terms and Conditions.  MetroPCS has located a Start of Service Request form (Def.'s Ex. 50) filled out by senior sales associate Mabel Malone during the March 18, 2009 transaction at the MetroPCS store in Winter Park, Florida.  Ms. Malone remembers Ms. Williams' face although she does not have a recollection of their interaction.  Ms. Malone added a line to Ms. Williams' account.  The form does not bear Ms. Williams' signature. While Ms. Malone does not remember anything specific about her interaction with Ms. Williams, it was Ms. Malone's practice to provide customers with a copy of the Start of Service Request form (which would have the Terms and Conditions attached) and to keep a copy of it at the store. According to Ms. Malone, the Start of Service Request form is not a binding contract.

Rafael Alvarez, the store manager for the MetroPCS store in Winter Park and Ms. Malone's supervisor, similarly does not consider the Terms and Conditions to be a contract.  According to Mr. Alvarez, there is no trick in MetroPCS saying "no contract," because in fact there is no contract.  He, like Ms. Malone, does not view the Start of Service Request form as a contract; he considers it "an agreement of our terms and conditions."  (Hr'g Tr. Apr. 19, 2010).

Hope Norris, the MetroPCS Director of Customer Operations, testified that MetroPCS customers are not bound by a contract.  The "no signed contract" advertisements, according to Ms. Norris, are MetroPCS's way of saying it does not bind a customer in a typical two-year wireless contract like most other companies.

With respect to billing, Ms. Williams would receive a text message informing her of the amount owed, her account number, and when her payment was due.  Because there would be an

additional charge if she wanted an electronic or paper bill in addition to the text message, Ms. Williams would pay in person at the store.  Later, when her daughter instructed her, Ms. Williams paid six of her last bills online, using the website where, if she had looked at the bottom left hand corner, she would have seen in small font the link "terms and conditions." But Ms. Williams never saw this link nor did she access it.

Although MetroPCS has more than 6.1 million customers, it has never arbitrated a dispute with any of its customers.

**C.     Legal Conclusions**

MetroPCS repeatedly advertises "No Contract."  It does so prominently in its advertising on television.  It does so prominently on the covers of the boxes containing its cellular telephones.  It does so prominently on its website.   It does so all the while it slips past the consuming public that indeed, there is a contract.  It is a contract that according to MetroPCS goes by another name: an agreement to Terms and Conditions of Service.  And it is this second contract which MetroPCS seeks to enforce against Ms. Williams by compelling her to arbitrate her disputes with MetroPCS, abandoning her request to represent a class of consumers.  MetroPCS is entitled to enforce the real contract, the so-called "Terms and Conditions of Service," because on March 18, 2009, Ms. Malone gave Ms. Williams these Terms and Conditions, Ms. Williams thereafter placed calls or otherwise used the MetroPCS service, and Ms. Williams is deemed to have accepted the contract.

The Federal Arbitration Act ("FAA") establishes a general federal policy favoring arbitration. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217-18 (1985).  "While there is a liberal federal policy favoring arbitration agreements, 'the FAA's strong proarbitration policy only applies

Case No.  09-22890-CIV-Altonaga/Brown

to disputes that the parties have agreed to arbitrate.'"  *Becker v. Davis*, 491 F.3d 1292, 1298 (11th

Cir. 2007) (quoting *Klay v. All Defendant*s, 389 F.3d 1191, 1200 (11th Cir. 2004)).  Consequently,

when considering a motion to compel arbitration pursuant to Section 4 of the FAA, a district court

must undertake a two-step inquiry.  *See Scott v. EFN Invs., LLC*, 312 F. App'x 254, 256 (11th Cir.

2009) (citing *Klay*, 389 F.3d at 1200); *Patriot Mfg., Inc. v. Dixon*, 399 F. Supp. 2d 1298, 1300 (S.D.

Ala. 2005) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-28

(1985)).  The first step is to determine whether the parties agreed to arbitrate the dispute, a

determination made by reference to the "'federal substantive law of arbitrability, applicable to any

arbitration agreement within the coverage of the [FAA].'"  *Mitsubishi Motors Corp.*, 473 U.S. at 626

(quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)).  In

determining whether a binding agreement arose between the parties, the court is to apply the contract

law of the state that governs the formation of the contract, in this case, Florida.  *See Schoendorf v.

Toyota of Orlando*, No. 6:08-cv-767-Orl-19DAB, 2009 WL 1075991, at *4 (M.D. Fla. Apr. 21,

2009) (quoting *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367-68 (11th Cir. 2005)).

If the court concludes that the parties did agree to arbitrate the dispute in question, then the second

step is to consider whether legal constraints external to the parties' agreement foreclose the

arbitration of those claims.  *See Patriot Mfg., Inc.*, 399 F. Supp. 2d at 1301.

    With respect to the first step of the analysis, the parties acknowledge that no signature is

required to meet the "written" requirement of the FAA; rather acceptance of the contract may be

manifested by performance.  *See, e.g., Caley*, 428 F.3d at 1369 ("employees' acceptance was by

continuing their employment").  And while "as with any other contract, the parties' intentions

9

control, . . . those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp.*, 473 U.S. at 626.  "Presumption notwithstanding, 'the courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties.'" *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1057 (11th Cir. 1998) (quoting *Goldberg v. Bear, Stearns & Co., Inc.*, 912 F.2d 1418, 1419-20 (11th Cir. 1990)). At bottom, parties cannot be forced to submit to arbitration if they have not agreed to do so.  *See Goldberg*, 912 F.2d at 1419.

Here, Ms. Williams did not explicitly by her words or signature agree to arbitrate.  But on March 18, 2009, Ms. Malone gave Ms. Williams the MetroPCS Terms and Conditions.  *See, e.g., Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007) ("Comcast's evidence of its policy to provide the Subscriber Agreement to new customers was relevant to show that Schwartz did in fact receive a copy.").  Ms. Williams' acceptance of the benefits of the Terms and Conditions following her interaction with Ms. Malone constituted acceptance of that agreement, and the law recognizes that MetroPCS has the right to specify the kind of conduct that will constitute acceptance. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1150 (7th Cir. 1997) (enforcing arbitration agreement found in software box because the plaintiff did not return computer within 30 days; it mattered not that the plaintiff had not read the contract).  Ms. Williams accepted the benefits by her continued use of MetroPCS's services after receiving the Terms and Conditions, signaling her acceptance of the MetroPCS offer, as the text quoted in these Findings from the Terms and Conditions makes clear. *See, e.g., Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002) (plaintiff's continued use of AT&T's long-distance service constituted an acceptance of AT&T's offer, contained in a customer

10

Case No.  09-22890-CIV-Altonaga/Brown

service agreement in a mailing sent to plaintiff); *Rivera v. AT&T Corp.*, 420 F. Supp. 2d 1312, 1320-21 (S.D. Fla. 2006) ("Plaintiff Rivera admits that she continued AT&T service for more than a year after AT&T mailed her a CSA . . . . [T]hus, the CSA binds Plaintiffs.").

The undersigned believes Ms. Williams' testimony that she did not see the Terms and Conditions link on the MetroPCS website, but again, because she was given those Terms and Conditions by Ms. Malone, her failure to read any particular version of them is of no consequence. *See Ozormoor v. T-Mobile USA, Inc.*, No. 08-11717, 2008 WL 2518549, at *1-2 (E.D. Mich. June 19, 2008) (plaintiff entered into a one-year service agreement for wireless phone service and renewed the agreement; both agreements contained terms requiring arbitration, and plaintiff received at least one physical copy of the agreement containing the arbitration provisions).  Ms. Williams continued paying her bills through the MetroPCS website and had access to the Terms and Conditions through the link at the bottom of the home page, which, if before receipt of the physical copy of the Terms had not been of interest to her, should have been after her interaction with Ms. Malone.  *See, e.g., Brueggemann v. NCOA Select, Inc.*, No. 08-80606-CIV, 2009 WL 1873651, at *2 (S.D. Fla. June 30, 2009) (arbitration ordered where plaintiff, when purchasing on defendant's website, was informed he was agreeing to terms and conditions); *Briceno v. Spring Spectrum, L.P.*, 911 So. 2d 176, 178 (Fla. 3d DCA 2005) (arbitration ordered where the plaintiff entered into a contract for cellular telephone service which was contained in the packaging of defendant's telephone; in an invoice to the plaintiff the defendant informed her that changes to the terms and conditions could be found on defendant's website; and plaintiff admitted to seeing the terms and conditions internet link but did not care to click it).  In sum, beginning on March 18, 2009, Ms. Williams was on notice of

11

the Terms and Conditions of Service, and she is therefore deemed to have accepted and agreed to be bound by them, including the arbitration provision contained therein, even if she never read them.

Furthermore, given the language quoted from the Terms and Conditions ("This arbitration agreement applies to all Claims now in existence or that may arise in the future."), MetroPCS's arbitration provision is broad enough to cover Ms. Williams' disputes with MetroPCS that predate the March 2009 transaction. *See Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir. 1993) (arbitration is a matter of contract; arbitration agreement was broad enough to cover the dispute at issue even though it occurred before the execution of the agreement).

Having resolved the first question of whether the parties agreed to arbitrate, the next issue is whether legal constraints external to the parties' agreement foreclose the arbitration of Ms. Williams' claims. Ms. Williams asserts MetroPCS is estopped from enforcing the Terms and Conditions because it repeatedly stated there would be "No Contract." She also maintains the arbitration agreement is procedurally and substantively unconscionable and is therefore unenforceable.

As to the estoppel argument, the evidence presented concerning MetroPCS's claims – in its advertising, on its website, and on the cover of its cellular phones – that there is "No Contract" does not serve to challenge the validity of the arbitration provision contained in the Terms and Conditions. Such evidence, sounding in fraud in the inducement, addresses the validity of the entire Terms and Conditions, and is evidence the arbitrator is to consider. As the Supreme Court explained in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*:

> Under s4 [Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4], with respect to a matter within the jurisdiction of the federal courts save for the existence of an

> arbitration clause, the federal court is instructed to order arbitration to proceed once it is satisfied that 'the making of the agreement for arbitration or the failure to comply (with the arbitration agreement) is not in issue.'  Accordingly, if the claim is fraud in the inducement of the arbitration clause itself  −  an issue which goes to the 'making' of the agreement to arbitrate  −  the federal court may proceed to adjudicate it.  But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

388 U.S. 395, 403-04 (1967) (footnote call numbers omitted).  So, where a party attacks the validity of the entire contract, the matter is generally to be resolved by the arbitrator, "whereas a claim that the arbitration clause itself" is invalid is for the court to decide.  *John B. Goodman Ltd. P'ship v. THF Const., Inc.*, 321 F.3d 1094, 1095-96 (11th Cir. 2003) (citing *Prima Paint Corp.*, 388 U.S. at 402-04).  Ms. Williams' challenge to the Terms and Conditions is to the entirety of that agreement, and not simply to the arbitration provision contained within it.  Therefore, it is the arbitrator who must hear charges of fraud in the inducement of that agreement.  *See also Rivera*, 420 F. Supp. 2d at 1323.

Regarding unconscionability, whether an arbitration clause is unconscionable is a question of state law.  *Orkin Exterminating Co., Inc. v. Petsch,* 872 So. 2d 259, 264 (Fla. 2d DCA 2004).  *See also Paladino,* 134 F.3d at 1061 (arbitration clauses are interpreted according to ordinary state-law rules of contract construction).  The Eleventh Circuit Court of Appeals has recently certified to the Florida Supreme Court the question of whether Florida courts must evaluate both procedural and substantive unconscionability simultaneously in a balancing or sliding scale approach or independently and conclude their analysis if either one is lacking.  *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1143-44 (11th Cir. 2010).  In particular, in *Pendergast* the district court had concluded no procedural unconscionability was shown where the plaintiff had a meaningful choice

Case No.  09-22890-CIV-Altonaga/Brown

of whether to accept the terms of the Sprint contract, and had notice of the class action waiver when he executed the agreement and had time (14 days) to reject it and use another mobile phone carrier. *Id.* at 1135-36.   The Eleventh Circuit concluded it could not determine whether a Florida court would find Sprint's contract procedurally unconscionable and certified that question.  *Id.* at 1139. The Eleventh Circuit also posed the question to the Florida Supreme Court regarding whether a class action waiver is substantively unconscionable.  *Id.* at 1142.

Given the pendency of these questions to the Florida Supreme Court and the similar issues raised by Ms. Williams in this case, the undersigned will not address the unconscionability challenges at this time.  Rather, the undersigned elects to await that Court's decision and evaluate its effect on the unconscionability arguments raised here.  This case is stayed pending the Florida Supreme Court's resolution of the unconscionability questions posed.  *See CTI-Container Leasing Corp. v. Uiterwyk Corp.*, 685 F.2d 1284, 1288 (11th Cir. 1982) ("The inherent discretionary authority of the district court to stay litigation pending the outcome of related proceeding in another forum is not questioned.").  But because a stay cannot be immoderate or of an indefinite duration, *see id.,* the parties are required to report to the Court, by August 23, 2010, the status of the Florida Supreme Court's resolution of the certified questions.

The Clerk of the Court is to mark this case as **ADMINISTRATIVELY CLOSED**, and all pending motions are denied as moot.

14

Case No.  09-22890-CIV-Altonaga/Brown

**DONE AND ORDERED** in Chambers at Miami, Florida, this 21st day of April, 2010.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

15